*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                                                :
CHERYL HANEY                                      :
                                                                :
                        Plaintiff,                      :
                                                                :          Case No. 13-3033 (FLW)
            v.                                                :
                                                                :                **OPINION**
COMMISSIONER OF SOCIAL SECURITY :
                                                                :
                        Defendant.                    :
_____ :

**WOLFSON, United States District Judge:**

Plaintiff Cheryl Haney ("Plaintiff"), appeals from the final decision of the Commissioner of Social Security (the "Commissioner"), denying Plaintiff disability benefits under the Social Security Act ("Act"). Plaintiff contends that the record substantiates her claims that she is disabled, and requires a conclusion that she is entitled to disability insurance benefits. After reviewing the administrative record, this Court finds that the ALJ's decision is supported by substantial evidence in the record, and accordingly, affirms the ALJ's decision to deny Plaintiff disability benefits.

## I.      OVERVIEW

### A.      Procedural History

Plaintiff initially filed applications for Social Security Disability and Supplemental Security Insurance Benefits on April 7, 2009. AR 49. In these applications, Plaintiff alleged that her disability began on October 1, 2008, due to diabetes, vertigo, vision impairment, depression, anxiety, and pain/weakness in her left side. AR 51-53. Plaintiff's claims were first denied on

1

October 30, 2009, and again upon reconsideration on July 21, 2010.  AR 49.  On July 14, 2011, Plaintiff appeared at a hearing before an administrative law judge (ALJ), and on August 4, 2011, the ALJ issued an unfavorable decision, denying Plaintiff benefits on the basis that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act (the "Act"), during the relevant period.  AR 46-58.

Plaintiff then petitioned the Social Security Appeals Council (the "Appeals Council") for review of the ALJ's decision, which denied her request for review on March 21, 2013, making the ALJ's August 4, 2011 decision a final, appealable judgment.  AR 1.  Plaintiff then filed a Complaint in this Court on May 6, 2013, appealing from the ALJ's decision to deny Plaintiff benefits beginning from her October 1, 2008 alleged disability onset date.  *See* Dkt. No. 1.  In addition to appealing the ALJ's decision, Plaintiff also filed with this Court a motion to supplement the record, which the Commissioner opposes.  *See* Dkt. No. 13.  I address Plaintiff's motion, *infra*, in connection with my analysis of her appeal from the ALJ.

## B.    Background

Plaintiff, a high school graduate, was born in 1957, and was approximately 51 years old when her alleged disability began.  AR 54, 66.  Prior to her disability, Plaintiff performed work as a customer service representative at Wal-Mart.  AR 54.  Prior to the time Plaintiff alleges that her disability began, Plaintiff began experiencing pain in in her left leg.  AR 71.  She visited an emergency department in April 2007 with a limp and complaining of pain in her left leg and foot that was exacerbated with walking.  AR 388-89.  Plaintiff visited the emergency room several additional times between 2007 and the end of 2008 for various complaints, including: pain on her right side, dizziness, nausea, headache, chest pain, and weakness.  *See* AR 371-424. In April 2009, Plaintiff visited a hospital ambulatory care clinic complaining of fatigue and chest pain.  *See* AR

279-80.  Plaintiff returned to the same clinic in May 2009, after she experienced sudden, temporary loss of vision, as well as fatigue and chest pain.  In early June 2009, Plaintiff again visited the clinic due to restlessness and anxiety; she was diagnosed with anxiety and prescribed, *inter alia*, Xanax.  AR 275-76.  Throughout the remainder of 2009, Plaintiff visited various emergency rooms or ambulatory care clinics, reporting abdominal, left hand, and left leg pain, dizziness, loss of vision, and other similar complaints.  *See, e.g.*, AR 256-60, 271-72, 281-82, 442, 460-64.  Plaintiff went through a psychological intake in late June 2009, where she reported feelings of anxiety, depression, and fatigue.  AR 334-41.  In subsequent psychological visits, Plaintiff reported having anxiety attacks, or the fear of having anxiety attacks, as well as her belief that some of her mental health issues were due to her diabetes and vision issues.  AR 352.  Plaintiff also reported to her therapist that she had tried to work part-time on two occasions, but had to quit those jobs because she was "too slow" and had issues with her dizziness.  AR 350.  Based on these complaints, Plaintiff applied for benefits under the Act.  As noted, in connection with her application for benefits, Plaintiff also visited several medical professionals for evaluation of her physical and mental health.  I detail the relevant findings of Plaintiff's treating and evaluating medical professionals below.

### C.    Review of Medical Evidence

#### 1.   Physical Health

In April 2007, Plaintiff went to Raritan Bay Medical Center ("RBMC") emergency department with a limp, and reported pain in her left foot that was exacerbated by walking, and pain in the left leg; Plaintiff had previously been seen at St. Peter's University Hospital ("SPUH"), where she was diagnosed with tendinitis.  AR 388-389.  X-rays of the left foot taken that day at RBMC showed "calcaneal spurring."  AR 369.  Several months later, in July 2007, Plaintiff was

seen in the RBMC emergency room with complaints of "r[ight] l[ower] q[uadrant] and r[ight] flank pain, n[ausea] and v[omitting]."  AR 371.  A CT scan of abdomen-pelvis revealed "some minimal dependent atelectasis" in the lung base and a "discrete structure" associated with the left ovary, "possibly representing hemorrhagic cyst," prominent cervix "and fluid is suspected within the endometrial cavity."  AR 380.  A Pelvic ultrasound was recommended for further evaluation. AR 380.

On October 15, 2008, the Plaintiff went to the RBMC emergency room with the chief complaint of dizziness and nausea.  AR 395, 299.   At this time, Plaintiff was diagnosed with "[d]izziness (vertigo)" and was prescribed anti-vertigo medication.  AR 399-401.  On December 20, 2008, Plaintiff returned to the RBMC emergency room with complaints of headache, dizziness, chest pain with shortness of breath, with weakness that "comes and goes," and saying that she "feels like she has to vomit but can't."  AR 407.  Examination revealed that her heart rhythm was "sinus tachy[cardia]," with elevated blood pressure that normalized prior to her discharge; an EKG showed "borderline T abnormalities."  AR 407, 409, 413, 424.  Plaintiff was diagnosed with vertigo, hypertension, and diabetes mellitus.  AR 414.

On April 2, 2009, Plaintiff was seen in the SPUH ambulatory care clinic with complaints of fatigue and chest pain.  AR 279.  Her fasting blood glucose was measured to be high.  AR 280. The treating physician prescribed Metoprolol and Glipizide, the latter for better blood sugar control, and her Zocor prescription was increased.  AR 280.  On May 14, 2009, Plaintiff returned to the SPUH ambulatory care clinic complaining of a sudden episode of loss of vision, as well as continued fatigue, occasional dizziness, and chest pain.  AR 277.  Her blood sugar measurements were not extreme; the treating physician assessed that Plaintiff's chest pain "sounds unstable however also [had] a component of acid reflux."  AR 278.  The nursing notes for this visit indicate

4

that Plaintiff also "occasionally feels 'knotting up in [left] upper chest esp[ecially] at night snores, wakes up feeling she is going to choke." AR 278.  On June 5, 2009, Plaintiff again returned to the SPUH ambulatory care clinic, presenting with "restlessness and anxiety."  AR 275.  Plaintiff specifically complained of having "an anxiety attack (feeling of doom, hyperventilation) and had to . . . call[] her friend to take her to the ER" where she "vomited food contents" and "was given IV reglan." AR 278.  On examination at this time, blood pressure was elevated, and restlessness and mildly distended abdomen were observed.  AR 278.  Plaintiff was diagnosed with anxiety, for which she was prescribed Xanax and referred to mental health treatment; her previous prescriptions of Zocor, Metformin and Glipizide were continued.  AR 276.

On June 7, 2009, Plaintiff visited the SPUH emergency department with complaints of abdominal pain, "dizz[iness], l[ef]t hand and leg pain," and nausea.  AR 256.  She was prescribed Bactrim and was discharged into the care of a family member.  AR 257, 260.  Slightly over a week later, on June 15, 2009, Plaintiff went to the SPUH ambulatory care clinic with complaints of constant headaches, blurred vision, nasal congestion, and continued anxiety attacks.  AR 271.  At this time, Plaintiff was noted to have had lost approximately 10 pounds of weight over the previous months; her blood glucose was within normal range.  AR 267, 271-72.  The primary assessment was "[a]nxiety/depression"; Xanax was continued.  AR 272.

On examination on June 30, 2009, Dr. Grimes of University Medical Group ("UMG") noted that the Plaintiff had experienced a hypoglycemic episode the previous Friday, having taken her Metformin without eating.  AR 460.  Plaintiff also reported having "had poor appetite" recently, as well as worsening eyesight.  AR 460.  The doctor noted that Plaintiff had "[hemoglobin] A1C 7%," and that Plaintiff was overdue for an ophthalmologist visit.  AR 460.  Although Dr. Grimes deemed the A1C of 7% to be "pretty good," she also encouraged Plaintiff to

eat regularly; the doctor stopped the Glipizide prescription "for now until [Plaintiff was] eating more regularly," while continuing the Metformin.  AR 461.  Dr. Grimes opined that Plaintiff's weight loss was "[p]robably due to lack of appetite coupled with fluctuating blood sugars and taking [M]etformin" and fatigue was "[p]robably due to hypoglycemic episodes.  AR 462.

On June 29, 2009, the Plaintiff was seen for a follow up visit in the SPUH ambulatory care clinic, and also presented with continued complaints of "dizziness episodes along with palpitations most times during the day not related to activity."  AR 281.  Plaintiff received independent diagnoses, from two separate treating physicians, of diabetes mellitus, controlled hypertension, and dizziness.  AR 282.  At that time, it was also ntoed that she may need an EKG or cardiology assessment.  AR 282.

On July 22, 2009, Dr. Darvin of Santamaria Eye Center ("Santamaria") preformed a retinal consultation on Plaintiff following an episode of sudden visual loss, with some itching and tearing, and a positive fasting blood sugar test.  AR 442.  Dr. Darvin noted that while Plaintiff did have diabetes in the eye, she was not seeing well because her "right eye main vein is clotted [and] retina is swollen."  AR 442.

In a September 20, 2009 consultative examination report by Dr. Changaramk Sivadas, the doctor noted that Plaintiff could not see out of her right eye, and that on evaluation he was "unable to visualize right fundus."  AR 317-18.  Dr. Sivadas assessed poorly controlled diabetes, chest pain, and muscles of hands cramping, noting that "[c]oronary heart disease and angina cannot be ruled out as she is diabetic, hypertensive, and hyperlipidemic as well as postmenopausal."  AR 319.  His further assessment included vertigo, uncontrolled hypertension, and anxiety attacks.  AR 319.

On October 29, 2009, a physical Residual Functional Capacity ("RFC") assessment was completed by a state agency, non-examining medical consultant, David X. Schneider.  AR 320-27.  The consultant found Plaintiff to be limited, *inter alia*, with respect to depth perception, noting "no work requiring binocular vision or depth perception; no vision right eye normal near and far vision with left eye."  AR 323.  The RFC also assessed the Plaintiff to be limited to "occasional" crawling, "never" climbing ladder/rope/scaffolds, and to avoiding concentrated exposure to extreme cold, heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation etc., as well as all exposure to hazards such as machinery, heights, etc.  AR 322, 324.

At a routine follow up visit for her medical conditions, Plaintiff was seen by Dr. Sung and Dr. Kim at Robert Wood Johnson (RWJ) Medical Group, on December 22, 2009.  At this time, Plaintiff reported that she had visited an eye doctor earlier in the month, and was taking eye drops for her retinal vein occlusion.  AR 454.  The doctors noted in connection with Plaintiff's diabetes that her appetite was "still on-and-off, possibly related to her moods/anxiety" and that she felt "shaky/nauseated," having a previously measured lowest blood sugar in the 70's.  AR 454.  Plaintiff was noted as no longer taking Glipizide, due to hypoglycemia, taking Metformin instead, and that her Enalapril prescription for her hypertension had been increased at her last doctor's visit.  AR 454.  Plaintiff was scheduled to have a stress test for her chest pain, and it was also noted that Plaintiff reported ongoing neck pain at the time.  AR 454.  In connection with Plaintiff's mental health, the doctors noted that she was seeing a therapist and being prescribed Paxil; however, Dr. Kim noted that Plaintiff continued to report occasional suicidal thoughts and anxiety in public places.  AR 454.  Dr. Kim further noted that Plaintiff was "tired appearing" and with "depressed affect."  AR 455.  Plaintiff was assessed with central retinal vein occlusion, diabetes mellitus, hypertension, episodes of hypoglycemia, anxiety, chest pain, and neck pain.  AR 456.

On April 9, 2010, Plaintiff was seen by Dr. Grimes, following a visit the previous day for palpitations that had somewhat but not fully resolved.  AR 448.  Dr. Grimes diagnosed atypical chest pain, noted "consistently" high blood pressure, prescribed a low dose of Toprol and decreased her Enalapril "to decrease risk of hypotension."  AR 449.

On April 20, 2010, the Plaintiff saw Dr. Sung and Dr. Kim again in follow-up, reporting headaches and left-sided neck pain since starting Toprol, shortness of breath that caused her to need to stop after walking two blocks, and leg pain that caused difficulty completing the steps to her house.  AR 445.  On examination, Plaintiff was noted to be "limping when ambulat[ing] favoring left leg," and had "tenderness to deep palpation in the left groin, pain with passive hip R[ange] O[f] M[otion] on the left side, weakness on the left side with 4/5 strength in left quads, hamstrings and ankle dorsiflexion."  AR 445-46.  With respect to her mental health, the doctors noted that Plaintiff had "slightly brighter affect today . . . although still depressed/tired looking." AR 446.  Her blood pressure medication was changed from Toprol, but her Paxil prescription was left unchanged.  AR 446.

At a subsequent eye examination by Dr. Darvin on April 21, 2010, right eye visual acuity was "20/100- uncorrected, 20/60- on pinhole test," and on the measurement for corrected near vision for the right eye, Dr. Darvin noted, "In & out."  AR 440.  Vision in the left eye was 20/20, with the notation "shadows on letters—subsides [with] larger letters."  AR 440.  Plaintiff received Avastin, and, following that, Plaintiff was diagnosed with central retina vein occlusion."  AR 441.

On May 18, 2010, Plaintiff underwent a physical therapy evaluation at RWJ Hospital, at which time her chief complaints were left ankle pain and low back pain.  AR 480.  Plaintiff's balance was assessed as "Fair+/Good".  T 480.  Manual muscle testing indicated that the right hip and lower extremity were "grossly 4+/5" and the left hip and lower extremity "grossly 4-/5".  AR

8

481.  A straight leg raise test was positive on the left.  AR 481.  Plaintiff's goals included a reduction of pain levels and an increase in muscle strength; it was noted that by the end of treatment, although Plaintiff experienced a reduction in pain, it did not appear that her strength increased.  AR 485.

    2.  Mental Health

On June 25, 2009, an initial psychological intake was done by Edward Banasiak, Ph.D., Principal Clinical Psychologist, Raritan Bay Mental Health Center ("RBMHC").  AR 339-41.  At the intake, Plaintiff reported "episodes of anxiety marked by feeling 'like everything is closing in on me.'"  AR 339.  Episodic feelings of moderate depression, decreased willingness to travel or go places alone were also reported, and the Plaintiff also stated, "I think I'm having panic attacks."  AR 339.  Reported symptoms included difficulty falling asleep, interrupted sleep, fatigue, episodic feelings of panic, difficulty breathing, irritability, light headedness, fear of dying, and fear of traveling alone because of fear of an attack.  AR 339.  Dr. Banasiak noted that these symptoms had reportedly been present for the past year; however Plaintiff stated that they had improved recently.  AR 339.  On examination, Plaintiff's mood was observed to be "moderately depressed," insight was "limited" and decreased appetite was reported.  AR 339, 341.  Socially, Plaintiff reported minimal contact with other people, except for her immediate family.  AR 33.  Following Plaintiff's intake, at a July 7, 2009, therapy appointment, Plaintiff reported "daily episodes of anxiety," which she thought may be related to lower blood glucose levels, and that she had scheduled an appointment with an ophthalmologist because of her decreased eyesight.  AR 352. At the time, Dr. Banasiak advised Plaintiff to make an appointment with a psychiatrist.  AR 352.

On July 13, 2009, Plaintiff was evaluated by Dr. P. Gude, a psychiatrist at RBMHC. Plaintiff related worsening "attacks," which she had told her primary care doctor about but, she

complained, about which the doctor did nothing.  AR 334.  Dr. Gude observed, *inter alia*, "poor eye contact, [illegible] responses often follows the lead," mood "depressed," affect "constricted" and stream of speech "[p]sychomotor retardation +".   AR 336.  Dr. Gude's Axis I diagnosis was depressive disorder with anxiety.  AR 337.  Dr. Gude started Plaintiff on Paxil and instructed her to continue therapy and follow up in one month.  AR 338.  The next day, Plaintiff went to UMG for follow-up and was seen by Dr. Willett, who noted that Plaintiff had "severe depression and anxiety" for which she had been seen at RBMHC and was given a prescription for Paxil, as well as that Plaintiff was continuing Ativan.  AR 458.  Dr. Willett further noted Plaintiff's complaints of memory problems and confusion when very depressed, that she had lost 25 pounds over the past few months due to depression and not wanting to eat, and that she had nausea and vomiting occasionally, and sometimes diarrhea.  AR 458.

On August 5, 2009, Plaintiff underwent a state-ordered mental status examination by Dr. Anne Marie Resnikoff.  AR 296-98.  Dr. Resnikoff observed, *inter alia*, that Plaintiff "appears lethargic and she feels tired and she has also lost 20 pounds due to diminished appetite."  AR 296. Dr. Resnikoff described Plaintiff's speech as "unclear at times, unevenly paced and difficult to understand due to her very soft tone of voice and long latency in responding."  AR 297.  Dr. Resnikoff also noted that Plaintiff "was sluggish and exhibited some insecurity in her responses to questions asked," and that Plaintiff was unable to respond to simple numerical calculations, unable to perform serial sevens and displayed poor general knowledge.  AR 297.  Although Plaintiff was able to identify the names of five common objects in the room, she was only able to recall, in delayed recall, the names of three of these common objects.  AR 297.  And although Plaintiff recalled up to eight digits going forwards, she only could go backwards four digits in immediate recall.  AR 297.  Dr. Resnikoff noted that Plaintiff "denied any suicidal or homicidal ideation,

intent, plan or attempts.  However, she then recanted and reported suicidal thinking."  AR 297.

Socially, Plaintiff was noted as maintaining "limited interpersonal relationships."  AR 297.  Dr.

Resnikoff further indicated that Plaintiff's "mood during this examination was noted to be

depressed and her affect was congruent to mood"; "[w]hen presented with questions that were

intended to assess her social planning ability and capacity to formulate practical judgment,

[Plaintiff] had some difficulty responding."  AR 297.  Dr. Resnikoff's Axis I diagnostic impression

was "[a]djustment disorder with depressed mood," and she assigned an Axis V diagnosis GAF as

"Present: 50 and Past: 50."  AR 297.

On August 13, 2009, Dr. Joan F. Joynson, Ph.D., a non-examining state agency consultant,

completed a mental RFC form and a Psychiatric Review Technique form based on Plaintiff's

mental health records from RBMHC up through July 7, 2009.  AR 299-315.  Dr. Joynson's

diagnoses were moderate form of major depressive disorder, and panic disorder.  AR 302, 304.

Dr. Joynson opined that Plaintiff had moderate difficulties in maintaining concentration,

persistence or pace, and moderate limitations in the ability to maintain attention and concentration

for extended periods and in the ability to complete a normal work-day and workweek without

interruptions from psychologically-based symptoms, and to perform at a consistent pace without

an unreasonable number and length of rest periods.  AR 309, 313-14.  Dr. Joynson also noted that

her assessments were based in part on information that the Plaintiff cares for her children, is

capable of shopping, and came alone to the interview.  AR 315.

On August 18, 2009, Plaintiff had her second appointment with Dr. Gude, the psychiatrist,

at which time Plaintiff reported having had no panic attacks, but "felt as though she is going to

have one.  AR 342.  Dr. Gude again indicated an Axis I diagnosis of depressive disorder with panic

anxiety, and increased the amount of Plaintiff's Paxil prescription.  AR 342.

11

On September 23, 2009, in a therapy session with Dr. Banasiak, Plaintiff reported having gone through two jobs with Work First New Jersey ("WFNJ") over the previous months: a job at a nursing home, which lasted three weeks because the employer found Plaintiff to be "too slow," and a job at Perth Amboy City Hall, which she lost after a month "due to dizziness and anxiety." AR 350.  Plaintiff also reported continuing to take Paxil.  AR 350.  In connection with that visit, Dr. Banasiak completed a MED-1 report form for WFNJ, stating diagnoses as "Depression & Anxiety (300.21 & 296.223)" and opining that the Plaintiff could not work full-time and could not participate in a WFNJ part-time work activity, and that this incapacity would last at least until April 1, 2010.  AR 488-89.

Plaintiff returned to Dr. Gude on October 15, 2009, and reported that she was not feeling well.  AR 343.  Specifically, Dr. Gude noted that Plaintiff stated that her "medication is too strong" and that it "makes me feel better but I feel too sleepy.  Some times I have to take a nap."  AR 343. Dr. Gude decreased the Paxil and prescribed long-acting Paxil.[1]  AR 343.

On December 4, 2009, Plaintiff reported to Dr. Banasiak decreased feelings and symptoms of depression, but episodic, and also having had "anxiety attacks," although with decreasing frequency, including an episode of anxiety/panic while riding on a train a month prior.  AR 348.

On January 12, 2010, Plaintiff saw Dr. Gude and reported sleeping well, but "still ha[ving] occasional anxiety when in crowds."  AR 344.  Similarly, on January 26, 2010, she related to Dr. Banasiak "'a little bit' of anxiety" and concerns about getting a job because she was unsure if she could function as she did previously.  AR 348.  Plaintiff discussed her treatment by the

---

[1]     Plaintiff also saw Dr. Banasiak that day in an unscheduled appointment, having missed her appointment with him because she forgot.   AR 349.

ophthalmologist for a problem with her eye, without being able to state what kind of a problem she was having, as well as her treatment by other doctors for her medical problems.  AR 348.

On March 5, 2010, the Plaintiff saw Dr. Banasiak and again reported experiencing episodic depression and episodic anxiety, including worries about her health, although she was continuing her Paxil as prescribed.  AR 347.  On March 18, 2010, Plaintiff returned to Dr. Banasiak, who noted that Plaintiff continued to complain of episodic anxiety/panic attacks, with decreased intensity and frequency of episodes; however, Dr. Banasiak also noted "agoraphobic features." AR 346.  At that time, Plaintiff reported a decrease in depression, but expressed concern about restarting work with WFNJ because of her health and eyesight.  AR 346.  Again, on March 30, 2010, Plaintiff related more episodic anxiety to Dr. Banasiak; current stressors were noted as including the WFNJ program and financial troubles.  AR 346.  On March 16, 2011, Dr. Banasiak, in another MED-1 form, indicated diagnoses of "Anxiety 300.21 (Panic disorder with Agoraphobia) and depression," and opined that Plaintiff could not work, with her expected incapacity until September 16, 2011.  AR 491-92.

### D.    Testimonial Record

Plaintiff testified before the ALJ on July 14, 2011.  AR 65-81; *see also* AR 55-56.  Plaintiff testified that since the date of her alleged disability, she has been unable to work in her former job as a customer service representative at Wal-Mart, or in any other capacity, due to her medical conditions.  AR 55.  Plaintiff testified that she is disabled because she has difficulty seeing, being tired all the time, vertigo and dizziness, diabetes, anxiety attacks, and diabetes.  AR 55-56. Specifically according to Plaintiff, she is dizzy all the time, has anxiety attacks, or the debilitating fear of anxiety attacks, always has pain in her left leg, sometimes to the extent she cannot walk on it, feels "drunk and weak" constantly, and cannot see well.  AR 55-56.  Plaintiff further testified

13

that she did not believe that her vertigo and dizziness were being adequately controlled by her medication, can sit for no more than one hour, cannot stand or be on her feet for even an hour, could not assess how much weight she could lift or carry, or be around too many people at a time. AR 55-56.  In that connection, Plaintiff testified that she lives with five of her children, but that she relies on the older children to provide care to the younger children; Plaintiff does not cook, do laundry, or clean, and shops only occasionally, and is driven to places by family members.  AR 55-5.  With regards to medical treatment, Plaintiff testified that she regularly sees a variety of doctors, including one for medication, an ophthalmologist, and attends a mental health center for psychiatric illness.  AR 55-56.

Regarding her previous work, Plaintiff testified that as a customer service representative in a Wal-Mart retail store, she interacted with customers and worked at the cash register on occasion. AR 69-70.  In that capacity, Plaintiff testified that her duties included resolving customer questions and concerns, and that she stood near the front of the store near a podium.  AR 70-71.  She testified that she was not able to sit while she was working, but that she was also not required to lift or carry anything heavy.  AR 71.

In connection with her testimony, Plaintiff submitted a function report from that she had completed.  Plaintiff's function report form indicates that she, "make[s] sure [my children] get up for school."  AR 168.  Plaintiff explained that her older children help take care of the younger ones.  AR 169.  With respect to dressing, Plaintiff stated that when she gets dizzy or anxiety hits her, she can't do anything. AR 169.  Plaintiff stated she "can't eat" and has "no appetite at all." AR 169.  Plaintiff described how she cannot concentrate, think clearly or see clearly; things she used to do before her illnesses, injuries or conditions which she can't do now include being able to travel alone, walk without her leg going out, and cannot see well."  AR 169.  With respect to

14

cooking, Plaintiff explained that "My children do, I am weak, and drowsy and so exhausted" that all she can do is prepare frozen dinners, get fast food, and make sandwiches. AR 170. Plaintiff described that her leg gives out and she "can't sit or stand for so long." AR 170. Plaintiff stated that her children do the chores, inside and out of the house, and that family members remind her to take care of her grooming and make sure she has her pill box with the pills in it. AR 170. Plaintiff state that she cannot go out alone because "I'm scared of getting a dizzy spell, and all alone, that's not a good feeling, I can't hardly breathe, I hyperventilate, and I get scared I feel like I'm going to die." AR 171. With respect to shopping for food, clothes, and necessities, the Plaintiff said she goes "twice a month" but does not always "feel good," and "when I can find someone to go with me." AR 171.

Plaintiff also submitted a third party function report form, dated May 30, 2009, completed by her daughter, Tiara Harris. AR 176-183. On the form, Ms. Harris indicated that her mother cannot go out alone, dressing and "getting ready" take her a long time, and that she has to keep stopping and sometimes she does not finish her personal grooming because it is too much. AR 176-78. With respect to how often Plaintiff shops and how long it takes, the daughter wrote that she gets aggravated if shopping lasts too long, and so the children do not often take Plaintiff with them. AR 176-78. The daughter also indicated that her mother is weak, that her legs "give out," that she "has horrible eyesight" and "can hardly see to follow [written] instructions"; that Ms. Harris, her older brother and sister help take care of the other children; that they usually do the cooking and "[e]veryone usually works together" to get the household chores done. AR 176-80. Ms. Harris explained that Plaintiff hardly goes anywhere socially and is usually home, and although Plaintiff used to be active, she is now "too weak to do anything or go anywhere. She is always sick." AR 176-180. The daughter stated that Plaintiff cannot pay attention for very long

because she cannot concentrate, and that Plaintiff "gets really stressed and it affects her health." AR 176-80.

### E.    The ALJ's Findings

In a decision dated August 4, 2011, the ALJ initially determined that Plaintiff met the insured status requirements of the Act from the alleged disability onset date through September 30, 2011.  AR 55.  After reviewing the record and applying the relevant law, the ALJ determined that Plaintiff was not under a disability within the meaning of the Act during the applicable disability period.  AR 58.

In reaching this conclusion, the ALJ applied the standard five-step sequential evaluation process to determine if Plaintiff satisfied her burden of establishing disability.[2]  AR 777-81.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of October 1, 2008.  AR 51.

At step two, the ALJ found that Plaintiff had the following severe impairment during this period of time: diabetes and vertigo.  AR 51.  In making the step two finding, the ALJ noted that the record evidence failed to support a severe eye impairment.  AR 51.  The ALJ set forth the evidence from Plaintiff's visits to Santamaria, from July 2009 through April 2010, during which time Plaintiff had relatively poor tests results from her right eye, but within normal limits on her left eye, and that Plaintiff received medication for her eyesight.  AR 51-52.  The ALJ also noted that in follow up visits with her doctor in 2010, Plaintiff reported that her eyesight was only intermittently blurry, and was not getting worse.  AR 52.  Additionally, and as set forth in more detail, *infra*, the ALJ further found that even if the condition of Plaintiff's left eye would preclude her from working around hazards, such as heights and heavy machinery, such a limitation would

---

[2]       *See infra* Part II.B.

not preclude Plaintiff from preforming her past relevant work. AR 52. In that connection, the ALJ explained that Plaintiff's current vision exceeds the minimum requirements to operate a motor vehicle in New Jersey. AR 52. Thus, the ALJ concluded that Plaintiff's vision did not rise to a severe impairment, but that even if it did, that impairment would not preclude Plaintiff from preforming her previous work. AR 52.

Similarly, the ALJ also rejected Plaintiff's claim that she suffered from a severe impairment due to her mental health. AR 52-53. The ALJ found that Plaintiff's medically determinable impairment of anxiety did not cause more than a minimal limitation on Plaintiff's ability to preform basic mental work activities. AR 52. In so finding, the ALJ referenced the disability regulations for evaluating mental disorders set forth in 20 C.F.R. Part 404, Subpart P, App'x 1, also known as the "paragraph B" criteria, which identify four broad functional areas: daily living; social functioning; concentration, persistence and pace; and episodes of decompensation. AR 52. With respect to daily living, the ALJ noted that Plaintiff had only a mild limitation from her anxiety, finding that the record demonstrated that Plaintiff had the ability to care for her children, including preparing frozen dinners, care for herself and her hygiene, exercise weekly, shop in stores, and watch television. AR 52. The ALJ discounted Plaintiff's personal testimony to the contrary, finding it not otherwise supported by the record. AR 52. With respect to social living, the ALJ also determined that Plaintiff had only a mild limitation, relying on record evidence that Plaintiff is able to socialize with her family and attend doctors' appointments without any problems, even occasionally alone. AR 52. As for concentration, persistence, or pace, the ALJ also found a mild limitation, noting that Plaintiff's July 2009 psychiatric evaluation at RBMHC included diagnoses of depression and anxiety that were not significantly limiting. AR 52. In that connection, the RBMHC evaluation found Plaintiff to be fully oriented, with good

impulse control, memory, attention, insight and judgment, and a GAF assessment of 70.  AR 52-53.  Finally, the ALJ found that Plaintiff had not experienced any episodes of decompensation.  AR 53.  In light of these paragraph B determinations, the ALJ found that Plaintiff did not have a severe impairment due to her mental health.  The ALJ further explained that no weight was accorded to the assessment of the consultative psychologist, Dr. Resnikoff, which included a GAF assessment of 50, because it appeared to be based entirely on Plaintiff's subjective complaints, and was inconsistent with the July 2009 RBMHC evaluation.  AR 53.

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments under the SSA that would automatically find Plaintiff disabled.  AR 53-54.

At step four, the ALJ determined that Plaintiff had the RFC for "lifting and carrying objects up to 20 pounds; frequently lifting and carrying objects weighing up to 10 pounds; standing, walking, and sitting up to six hours in an eight-hour day; pushing and pulling arm and leg controls; not requiring exposure to heights or dangerous machinery."  AR 54.  The ALJ employed a two-step process whereby the ALJ first evaluated whether there was "an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce the claimant's pain or other symptoms."  AR 54.  After determining that the Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the ALJ evaluated whether Plaintiff's assertions as to the "intensity, persistence and limiting effects" of her symptoms were credible when compared to the entire record.  AR 54.  As to that issue, the ALJ found that Plaintiff's statements regarding the extent of her pain and other symptoms were not credible because they were inconsistent with Plaintiff's medical history and RFC.  AR 56.  Specifically, the ALJ concluded that despite evidence supporting Plaintiff's severe impairments of

vertigo and diabetes, the evidence also established that Plaintiff retained the capacity to function adequately to preform many basic activities associated with work, that Plaintiff had lived with her diabetes in a substantially similar fashion for many years while she had been employed, and that Plaintiff's vertigo could be well-controlled with medication.  AR 56.  In any event, the ALJ further noted that Plaintiff's vertigo symptoms were incorporated into the RFC in the limitation that Plaintiff could not work around hazards.  AR 56.

The ALJ gave significant weight to the objective medical evidence in the case, as well as Plaintiff's testimony that was consistent with that evidence.  AR 55-57.  Notably, the ALJ explained that the entirety of the objective record evidence showed that Plaintiff's subjective complaints could not be reasonably expected from her medical impairments.  AR 56-57.  The ALJ further acknowledged, but rejected, the opinions of the state agency physicians that contradicted the RFC because they did not have all the evidence that was presented to the ALJ, or have the opportunity to question Plaintiff and assess her credibility.  AR 57.

In light of the RFC assessment and Plaintiff's own testimony, the ALJ determined that Plaintiff could perform her past relevant work as a customer service employee.  AR 57.  The ALJ noted that Plaintiff testified that her duties as a customer service employee required her only to stand in front of a store at a podium, and did not require lifting or carrying.  AR 57.  Based on this description, and the Social Security Agency Dictionary of Occupational Titles ("DOT"), which classified this type of job as "semi-skilled light work," consistent with Plaintiff's RFC, the ALJ found that Plaintiff's severe impairments do not preclude her from performing past relevant work.  AR 57.  Accordingly, the ALJ found Plaintiff to be not disabled at step four.  AR 58.

## II.    DISCUSSION

### A.    Standard of Review

On a review of a final decision of the Commissioner, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001).  The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record."  42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential.  *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance.  *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).  "It means such relevant evidence as a reasonable mind might accept as adequate."  *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992).  Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence.  *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

### B.    Standard for Entitlement of Benefits

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements.  *See* 42 U.S.C. § 423(c).  Plaintiff must also demonstrate the

"inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427.  An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability.  *Id.;* § 1382c(a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled.  *See* 20 C.F.R. § 404.1520.  First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity."  *Id.* § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).  If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits.  *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140.  Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5.  Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b).  These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling."  *Id.*  A claimant who does not have a severe impairment is not considered disabled.  *Id.* § 404.1520(c); *see Plummer*, 186 F.3d at 428.  Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments

listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List").   20 C.F.R. §
404.1520(a)(4)(iii).  If the claimant demonstrates that his or her impairments are equal in severity
to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and
is automatically entitled to benefits.  *See id.* § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47
n.5.  If the specific impairment is not listed, the ALJ will consider in his or her decision the
impairment that most closely satisfies those listed for purposes of deciding whether the impairment
is medically equivalent.  *See* 20 C.F.R. § 404.1526(a).  If there is more than one impairment, the
ALJ then must consider whether the combination of impairments is equal to any listed impairment.
*Id.*  An impairment or combination of impairments is basically equivalent to a listed impairment
if there are medical findings equal in severity to all the criteria for the one most similar.  *Williams*,
970 F.2d at 1186.

　　　　If the claimant is not conclusively disabled under the criteria set forth in the Impairment
List, step three is not satisfied, and the claimant must prove at step four whether he or she retains
the residual functional capacity to perform his or her past relevant work.  20 C.F.R. § 404.1520(e);
*Bowen*, 482 U.S. at 141.  If the claimant is able to perform previous work, the claimant is
determined to not be disabled.  20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42.
The claimant bears the burden of demonstrating an inability to return to the past relevant work.
*Plummer*, 186 F.3d at 428.

### C.　　Plaintiff's Arguments

　　　　Plaintiff raises several issues on appeal regarding the ALJ's decision denying her disability
benefits.  First, Plaintiff moves to supplement the record with additional medical evidence from
Santamaria, pertaining to Plaintiff's vision, and mental health records from RBMHC, pertaining
to Plaintiff's anxiety, agoraphobia and depression.  *See* Dkt. No. 13.  Plaintiff asserts that she meets

the standard for supplementing her medical record on appeal, and that these records show that the ALJ erred in finding that Plaintiff did not have severe impairments related to her vision or her mental health.  Beyond the motion to supplement, Plaintiff argues that the ALJ (i) at step two, erroneously rejected compelling medical evidence and Plaintiff's subjective testimony regarding her impairments, and (ii) at step four, failed to incorporate all of Plaintiff's limitations into the RFC, including considering the combined effects of Plaintiffs' impairments and the side-effects of her medications.  *See* Pl. Br., 1.  In response, the Commissioner argues that the ALJ properly considered and, where appropriate, rejected the objective medical evidence, and considered and rejected Plaintiff's subjective complaints where the ALJ found Plaintiff to be not credible; the Commissioner further argues that the ALJ's decision is based on the substantial evidence in the record, and notes that Plaintiff bore the burden of proving her limitations.  *See Wallace v. Sec'y of Health and Human Svcs.*, 722 F.2d 1150, 1153 (3d Cir. 1983).  I address each of these challenges in turn.

### 1.      Motion to Supplement

Plaintiff first moves to supplement the record with the addition of medical records from Dr. Darvin, Plaintiff's treating ophthalmologist at Santamaria, and mental health records from RBMHC, which were not included in the administrative record before the ALJ.  Plaintiff contends that these records are material and there is good cause to supplement because Plaintiff's current counsel was unable to procure them earlier, as a different attorney represented Plaintiff at the hearing before the ALJ.[3]  Plaintiff seeks an order supplementing the record with the additional

---

[3]      Plaintiff also argues, both in her motion to supplement and her direct appeal, that these additional records should be considered, and the matter remanded, because the ALJ had an affirmatively duty to develop the record, which did not occur here.  Plaintiff specifically argues that the ALJ should have realized, when looking at the current administrative records, that certain treatment records were incomplete, and thus remand is appropriate on this basis as well.  I disagree.

evidence and, in conjunction with her appeal, either a finding that Plaintiff is disabled based on the record and additional evidence, or a order remanding Plaintiff's case to the ALJ for further consideration based on the additional evidence.  The Commissioner opposes Plaintiff's motion, arguing that the records are merely cumulative, and do not contradict the ALJ's decision, and that Plaintiff has not demonstrated the requisite good cause to supplement the record.

Plaintiff's motion is governed by 42 U.S.C. § 405(g), which provides in relevant part:

The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g).  Thus, Plaintiff's motion must meet a threefold requirement. First, the evidence proffered must be "new," which courts have interpreted to mean that the evidence must either raise new issues or clarify existing ones, rather than merely reiterating past findings through new sources.  *Szubak v. Secretary of Health & Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1984) (*per curiam*).  Second, the new evidence must be material—*i.e.*, there must be a "reasonable possibility

---

First, although an ALJ should inquire of additional records where the administrative record provided is wholly lacking, the duty of which Plaintiff speaks—and the cases Plaintiff cites in support—relate to circumstances where a claimant is proceeding *pro se*.  Rather, "[t]he burden lies with the claimant to develop the record regarding his or her disability because the claimant is in a better position to provide information about his or her own medical condition.  *Money v. Barnhart*, 91 F. App'x 210, 215-16 (3d Cir. 2004) (citing *Bowen v. Yuckert*, 482 U.S. at 146 n.5, 20 C.F.R. §§ 404.1512(a) and 416.912(a)).  "The ALJ's only duty in this respect is to ensure that the claimant's complete medical history is developed on the record before finding that the claimant is not disabled."  *Id.* (citing 20 C.F.R. §§ 404.1512(d), 416.912(d)).  In cases where the claimant is represented by counsel before the ALJ, as is the case here, an "ALJ's passivity in developing the record will only be sufficient for remand or reversal when it has clearly prejudiced the claimant, which is not apparent here."  *Cartagena v. Comm'r of Soc. Sec.*, Civ. No. 05712-WJM, 2012 WL 1161554, at *4 (D.N.J. Apr. 9, 2012) (citing *Livingston v. Califano*, 614 F.2d 342, 345 (3d Cir. 1980); *Domozik v. Cohen*, 413 F.2d 5, 9 (3d Cir. 1969)).  Here, there can be no finding that Plaintiff was prejudiced because, for the same reasons that Plaintiff's motion to supplement is denied, these additional records are not material to the ALJ's decision.  *Accord Money* 91 F. App'x at 216 (finding ALJ inquiry sufficient because "[n]othing else indicate[d] that the record lacked enough data for the ALJ to make a well-informed decision").

that the new evidence would have changed the outcome of the [Commissioner's] determination." *Id.*; *see also Cruz-Santos v. Callahan*, Civ No. 97-439, 1998 WL 175936, at *2 (D.N.J. Apr. 7, 1998) (quoting *Szubak*, 745 F.2d at 833).   Finally, good cause must exist as to why the new evidence was not incorporated in the prior proceedings.   *Szubak*, 745 F.2d at 833.

Here, Plaintiff seeks to submit two sets of record, the first pertaining to her vision, and the second pertaining to her mental health.[4]   The vision records are a complete set of records from Plaintiff's treatment by Dr. Darvin at Santamaria, from January 2010 through July 2012. According to Dr. Darvin's narrative report included with the records, Plaintiff's vision impairments include the following: central retinal vein occlusion with edema in 2009, with her visual acuity as good as 20/40; Plaintiff was treated intravitreally from 2010 to 2011; on Plaintiff's most recent exam in July 2012,[5] her uncorrected visual acuity was 20/80 in the right eye and 20/40 in the left eye; this compares to Plaintiff's best corrected vision in January 2012 of approximately 20/80 in the right eye and 20/20 in the left eye; in July 2012, Plaintiff had some macular edema that never resolved; although Plaintiff is diabetic, she has never had diabetic retinopathy.   Pl. Mot. to Supp., at 17.

These medical records from Dr. Darvin do not satisfy the standard necessary to supplement the administrative record under § 405(g) because they are not material.   The ALJ addressed Plaintiff's vision impairment in great detail, including many of the records that Plaintiff now seeks to submit.   In both the records considered by the ALJ and those attached to Plaintiffs' motion to

---

[4]     Because the Commissioner challenges Plaintiff's motion on materiality grounds, which, as discussed above, I find to be dispositive, I do not reach the issue of whether these records satisfy the "new" requirement of § 405(g).

[5]     To the extent that Plaintiff relies on Dr. Darvin's records for the time period after September 2011, such reliance is misplaced.   These records do not provide insight into Plaintiff's vision for her relevant disability period, and thus they are not material.

supplement, Dr. Darvin provides substantially similar diagnoses of Plaintiff's vision impairment for the time period from October 1, 2008 through September 30, 2011.  Put differently, nothing in the complete set of Dr. Darvin's records contradicts anything in those records that were before the ALJ, as relevant to Plaintiff's disability claim period.  Specifically, the ALJ noted that Dr. Darvin had found that Plaintiff had reduced visual acuity in her right eye, as well as some shadowing on letters, and received intravitreal treatment.  AR 51-52.  In the additional records supplied by Plaintiff, for the relevant time period, Dr. Darvin provided similar diagnoses and treatment.  Thus, Plaintiff has not established that these additional medical records satisfy the "material" requirement of § 405(g), and her motion to supplement Dr. Darvin's records is denied on this basis alone.  *Szubak v. Secretary of Health & Human Servs.*, 745 F.2d at 833 (materiality requires a "reasonable possibility that the new evidence would have changed the outcome of the [Commissioner's] determination").

The other set of additional records Plaintiff seeks to submit are from RBMHC and pertain to Plaintiff's mental health.  These additional records of Plaintiff's treating psychiatrist include similar Axis I diagnoses of depression and anxiety, and also include the following observations: notes for April 19, 2010 "mood [undecipherable]," "insight, judgment and impulse control good," Paxil prescribed, and GAF 70-75; notes for September 23, 2010: "depression is slightly better but has anxiety in crowds," "mood mildly depressed," Paxil prescribed, and GAF 70-75; notes for March 11, 2011: "[o]ccasionally has feelings of sadness but they last [a] very short time," "mental status unremarkable," "judgment and impulse control good," Paxil prescribed and GAF 75-80; notes for September 8, 2011: "cheerful, offers no complaints" except of being afraid to leave house, Paxil prescribed, and GAF of 75-80.  Pl. Mot. to Supp., at 43-46.

These additional mental health records, like the additional vision records, do not satisfy the standard necessary to supplement the administrative record under § 405(g) because they also are not material.   The ALJ's decision addressed Plaintiff's claimed mental health impairment, including records from RBMHC, noting that Plaintiff had reported complaints related to anxiety, depression, and socialization.   Reviewing those records, the ALJ concluded that nothing in Plaintiff's mental health records supported a finding of anything more than a mild limitation.  AR 52-53.  Nothing in the additional records of Dr. Gude contradicts or undermines the records that were before the ALJ; indeed, these additional records lend further support to the ALJ's conclusion that Plaintiff did not have a severe mental health impairment.  Dr. Gude's supplemental records show that during her evaluations by the psychiatrist, her mental health status improved, did not worsen, over the relevant disability time period, and that she consistently had a GAF of 70 or higher, which is wholly consistent with the ALJ's findings.   Accordingly, Plaintiff has not established that these additional mental health records satisfy the "material" requirement of § 405(g), and her motion is denied on this basis alone for the RBMHC records. *Szubak v. Secretary of Health & Human Servs.*, 745 F.2d at 833.

In addition, Plaintiff has failed to show that good cause exists to supplement the administrative record with either Dr. Darvin's or Dr. Gude's records.  In support of her motion, Plaintiff contends that good cause exists because she is represented by new counsel on appeal, and her previous counsel was not diligent in obtaining these records.  This circumstance is insufficient to provide good cause for Plaintiff's motion.

In determining whether good cause exists to supplement the administrative record, courts have recognized that Congress intended this aspect of § 405(g) to be sparingly applied.  Indeed, the *Szubak* case upon which Plaintiff relies explicitly noted, in connection with the good cause

requirement: "claimants should generally be afforded only one fair opportunity to demonstrate eligibility for benefits under any one set of circumstances." *Szubak*, 745 F.2d at 834. To further this objective, parties have been required to "provide a logical reason [as to] why the proffered additional evidence was not, or could not have been, presented to the Secretary for inclusion in the record during the administrative proceedings." *DeMoss*, 706 F. Supp. at 309; *see also Szukak*, 745 F.2d at 834 ("A claimant might be tempted to withhold medical reports, or refrain from introducing all relevant evidence, with the idea of obtaining another bite of the apple if the Secretary decides that the claimant is not disabled."). In that regard, courts in this district have routinely rejected a change in attorney representation between the hearing and the appeal, without more, as providing good cause to supplement under § 405(g). *E.g.*, *Levesque-Cerka v. Astrue*, Civ. No. 06-6025 SRC, 2008 WL 699588 (D.N.J. Mar. 12, 2008); *Cruz-Santos v. Callahan*, Civ. No. 97-439, 1998 WL 175936 (D.N.J. Apr. 7, 1998). I am persuaded by these cases, and the lack of any case cited by Plaintiff to the contrary, and conclude that Plaintiff's change of counsel, on its own, is insufficient to demonstrate good cause to supplement the record. Lacking any other justification, Plaintiff's motion to supplement is therefore denied. I turn now to Plaintiff's challenge to the ALJ's decision.

### 2.   Step Two Challenge

At step two, the ALJ found that Plaintiff had the following severe impairments: diabetes and vertigo. AR 51. The ALJ noted that these impairments imposed more than a slight limitation on Plaintiff's ability to preform work related activity for 12 consecutive months, and thus are appropriately considered "severe." AR 51. Conversely, the ALJ rejected Plaintiff's claims that her vision impairment and medically determinable mental health impairment of anxiety were more than slight impairments. AR 51-53. Plaintiff argues that at step two, the ALJ erroneously ignored or discounted objective medical demonstrating that her vision and mental health impairments were

severe, as well as her complaints regarding her pain and weakness in her left side.

In rejecting Plaintiff's claim that her vision was a severe impairment, the ALJ noted that Dr. Darvin, Plaintiff's ophthalmologist, had observed that Plaintiff had some diminished visual acuity in her right eye, and slight diminished visual acuity in her left eye, when uncorrected; Dr. Darvin diagnosed Plaintiff with swelling and a clotted blood vessel in her right eye, which he treated with injections and eye drops over multiple office visits.  AR 51-52.  Plaintiff's eyesight did not significantly worsen, and the ALJ noted that at a later follow up visit, Plaintiff's UMD doctors noted that Plaintiff reported only intermittent blurriness, but no degradation in her vision. AR 52.  Ample objective medical evidence supports the ALJ's finding in this regard.  Indeed, Plaintiff does not dispute that the ALJ's finding is supported by substantial evidence,[6] and instead argues that the ALJ improperly ignored the opinion of the consultative examiner, Dr. Sivadas, that the fundus of Plaintiff's right eye could not be visualized, as well as limitations regarding binocular vision found by another state agency consultative doctor.  To the contrary, the ALJ noted that the opinions of the consultative physicians regarding Plaintiff's vision, while deserving of consideration given their expertise, were in conflict with the objective medical evidence supplied by Plaintiff's treating ophthalmologist and were only based on minimal findings.  The ALJ's rejection of these opinions of the consultative examiners, in favor of Plaintiff's treating doctor, was not error and is supported by the substantial evidence in the record.  *Burns v. Barnhart*, 312 F.3d at 129; *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991).

Plaintiff's argument that the ALJ incorrectly found that her mental health impairment was

---

[6]     Plaintiff poses only a cursory and vague challenge to the ALJ's finding based on Dr. Darvin's notes, contending that the ALJ "missed important notations in the record of Dr. Darvin." Pl. Br. at 25.  Such a generalized challenged is insufficient to raise an issue on appeal, particularly where Plaintiff does not otherwise challenge that substantial evidence of the record supports the ALJ's finding in this regard.

not severe fails for similar reasons.  The ALJ reviewed Plaintiff's treating psychiatrist records, as well as the function reports provided by Plaintiff and her daughter, and found that, after applying the paragraph B criteria, Plaintiff did not meet the requirements set forth by the regulations for a severe mental impairment.  AR 52-53.  Specifically, the ALJ noted that Plaintiff's subjective complaints at the hearing, in which she described limited ability to perform daily living and socializing, were contradicted by Plaintiff and her daughter's description of a more functioning and able individual.  AR 52-53.  Additionally, Plaintiff was diagnosed at RBMHC as having no persistence, pace, or concentration problems, and as having a GAF assessment of at least 70, which is consistent mild psychological symptoms.  AR 52-53.  In that connection, it should be noted that ALJ did not find that Plaintiff had no mental health impairments, only that the objective medical evidence and Plaintiff's own self-reported statements did not support a finding that those impairments were severe.  In sum, there is substantial evidence in the record supporting the ALJ's finding in this regard.

In challenging the ALJ's assessment of Plaintiff's mental health, Plaintiff only argues that the ALJ failed to incorporate evidence from a consultative examining doctor, Dr. Resnikoff.  As before, Plaintiff's argument is misplaced.  The ALJ addressed and rejected Dr. Resnikoff's opinion, and his lower GAF assessment, finding it inconsistent with the weight of the objective medical evidence, including that of Plaintiff's treating psychiatrist.  It is entirely appropriate for an ALJ to reject a consultative opinion when it is not supported by record evidence, and particularly where it is contradicted by Plaintiff's treating physician.[7]  *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) ("When a conflict in the evidence exists, the ALJ may choose whom to

---

[7]     For this same reason, I also determine that the ALJ did not err during the step four analysis by failing to include, *inter alia*, limitations based on Dr. Resnikoff's evaluation of Plaintiff's mental health.

credit . . . ."); *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir. 1987) (explaining that treating physicians should be accorded great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time"); *see also* 20 C.F.R. § 404.1527(d)(2) (providing that treating physician opinion entitled to controlling weight when supported by record medical evidence and not inconsistent with other substantial evidence in the record). Accordingly, I find that the ALJ did not err in determining that Plaintiff did not have a severe mental health impairment.

Plaintiff lastly argues that the ALJ should have found her impairment of left leg/foot pain and weakness to be severe. The ALJ did not mention her leg pain and weakness in the step two analysis; however, the ALJ did address Plaintiff's leg pain complaint in connection with the RFC determination in step four, ultimately rejecting her complaint because nothing in the objective medical evidence showed that Plaintiff's leg weakness and pain rose to the level of a severe impairment, preventing her from standing or walking, and further, that Plaintiff's subjective complaints of pain were not reasonable in light of the objective medical evidence. *See* AR 56-57; *see also Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (noting that ALJ's decision must be "read as a whole"). Indeed the objective medical evidence does not support Plaintiff's contention that she cannot walk or stand or has a severe strength deficiency in her left side. To the contrary, Plaintiff was never diagnosed with weakness that would prevent her from ambulating; rather, she was prescribed physical therapy and suggested to take over-the-counter analgesics to alleviate the pain, which treatment worked satisfactorily, as Plaintiff had favorable results from her physical therapy and reported a significant decrease in pain by June 2010. For this reason, I am satisfied that the ALJ determination that Plaintiff's leg pain and weakness is not a severe impairment, is supported by substantial evidence in the record, and thus the ALJ did not err in this regard. *See*

42 U.S.C. § 405(g); *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000) (Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record"); *Green v. Schweiker*, 749 F.2d 1066, 1069-70 (3d Cir. 1984) ("[S]ubjective complaints of pain, without more, do not in themselves constitute disability."). Furthermore, the ALJ found in Plaintiff's favor at step two, and thus any error at this step is considered harmless. *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005); *see also Lane v. Comm'r of Social Security*, 100 F. App'x 90, 95-96 (3d Cir. 2004) ("[N]one of [plaintiff's] treating physicians concluded that she had any work-related functional limitations. Absent such evidence, [plaintiff] cannot establish disability under the Social Security Act.").

### 3. Step Four Challenge

At step four, the ALJ determined that Plaintiff had the RFC:

> for lifting and carrying objects weighing up to 20 pounds; frequently lifting and carrying objects weighing up to 10 pounds; standing, walking, and sitting up to six hours in an eight-hour day; pushing and pulling arm and leg controls; not requiring exposure to heights or dangerous machinery.

AR 54.  Plaintiff challenges the ALJ's RFC determination on the basis that (i) the ALJ failed to include all of Plaintiff's documented impairments, as well as the combined effect of those impairments, including the side effects of Plaintiff's medications; and (ii) the ALJ failed to account for Plaintiff's testimony regarding the intensity of her limitations.[8]  Pl. Br. at 27-33.

---

[8]     To the extent that Plaintiff is raising a step three challenge in this regard, such a challenge is without merit.  At step three, the ALJ concluded, after reviewing the medical record and Plaintiff's testimony, that none of Plaintiff's impairments met or medically equaled any one of the impairments on the Impairment List.  AR 53; *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1. Specifically, the ALJ noted that Plaintiff's diabetes is evaluated under Listing 9.08 of Subpart P, but that Plaintiff's impairment did not meet the requirements of the listing due to a lack of medical evidence.  AR 53.  Similarly, the ALJ explained that Plaintiff's vertigo is evaluated under Listing 2.07 of Subpart P, which requires that there is a disturbance of labyrinthine-vestibular functioning, but there was no medical evidence supporting such a disturbance associated with Plaintiff's impairment.  AR 54.  Plaintiff does not argue that the ALJ erred in determining that Plaintiff's

In making a residual functional capacity determination, the ALJ must consider all evidence before her. *See Plummer v. Apfel*, 186 F.3d at 429; *Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986). Although the ALJ may weigh the credibility of the evidence, she must give some indication of the evidence which she rejects and her reason(s) for discounting such evidence. *See Burnett v. Comm'r of Social Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). In *Burnett*, the Third Circuit determined that the ALJ had not met his responsibilities because he "fail[ed] to consider and explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination." 220 F.3d at 121. "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705. In that regard, the ALJ must also consider and weigh all of the non-medical evidence before him. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983); *Cotter*, 642 F.2d at 707. A claimant's allegations of pain and other subjective symptoms are to be considered, *see Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (citing 20 C.F.R. § 404.1529), and, if they are consistent with objective medical evidence but the ALJ rejects such allegations, the ALJ must provide an explanation for doing so. *See Van Horn*, 717 F.2d at 873. Finally, the ALJ may also consider factors such as the claimant's

---

vertigo and/or diabetes fell within their respective listings that would deem her disabled. Similarly, Plaintiff raises no challenge that Plaintiff has any other impairment, or combinations of impairments, that would meet or equal the listed impairments pertinent to the step three analysis.

Reading the ALJ's decision, I am satisfied that the ALJ properly considered all the limiting effects of Plaintiff's impairments, even those which were found not to be severe, that were supported by the objective medical evidence in the record. As noted *supra*, in connection with Plaintiff's step two challenge, and *infra*, in connection with Plaintiff's step four challenge, the ALJ addressed each of Plaintiff's claimed impairments and assessed the limiting effect of those impairments in determining Plaintiff's RFC. *See Jones v. Barnhart*, 364 F.3d at 505 (noting that ALJ's decision must be "read as a whole"). Accordingly, I am satisfied that the ALJ did not err at step three.

daily activities, measures the claimant uses to treat pain or symptoms, and credibility.  20 C.F.R. § 416.929(c)(3); *see also Smith v. Califano*, 637 F.2d 968, 972 (3d Cir. 1981).

Plaintiff primarily agues that the RFC lacks any limitation based on (i) the severity of Plaintiff's vision impairment, (ii) the severity of Plaintiff's mental health impairments, and (iii) the severity and side-effects of Plaintiff's diabetes, including the side-effects of Plaintiff's medications.[9]  In connection with all three of these claims on appeal, Plaintiff argues that the ALJ ignored medical evidence in the record and/or failed to account for Plaintiff's subjective complaints of pain.  Review of the ALJ's decision reveals no support for Plaintiff's contentions.

As noted in connection with Plaintiff's step two challenge, *supra*, the ALJ addressed the record medical evidence related to Plaintiff's vision, including in relation to her diabetes, and psychological impairments, and properly addressed and rejected the contrary evidence from the consultative examiners as well as Plaintiff's own testimony.  Contrary to Plaintiff's assertion, the ALJ did not fail to address Plaintiff's mental health records, but weighed the opinions and records from RBMHC, including those of her treating physician Dr. Gude, against the assessments of the

---

[9]     To the extent that Plaintiff also challenges the RFC for failing to include limitations based on her claimed impairment of weakness/pain in her left side, that challenge fails because I have already determined that the ALJ's finding that Plaintiff had no such impairment is supported by substantial evidence in the record.  *See supra*, Part II.C.2.  Moreover, there is no objective medical evidence that would support limiting Plaintiff's RFC based on weakness or pain in Plaintiff's left side, and thus the ALJ properly discounted Plaintiff's subjective complaints in that regard. *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979) (holding that great weight is given to a claimant's subjective testimony *only* when it is supported by competent medical evidence).  In any event, the RFC limited Plaintiff to light work, which is consistent with the medical opinions provided by doctors and therapists who treated Plaintiff for her complaints of pain and weakness in her left side. *See, e.g.* AR 450 (records from RWJ, Dr. Grimes) ("Left leg pain . . . [h]as been 'off an on' for years . . . [p]ain alleviated with rest and taking weight off leg . . . [h]as not tried OTC analgesics . . . .").  Accordingly, I find that the ALJ's RFC in this regard is supported by substantial evidence in the record, and the ALJ did not err in failing to include more specific or restrictive limitations based on Plaintiff's subjective complaints of her left side pain/weakness.

consultative examiners and Plaintiff's subjective complaints.[10]   The ALJ determined that nothing in the opinions of Plaintiff's treating mental health providers at RBMHC supported limitations based on Plaintiff's mild mental health impairment, and discounted the contrary opinions of the non-treating examiners.   Similarly, the ALJ assessed Plaintiff's subjective complaints regarding her mental health impairment, specifically her depression and anxiety, and rejected the intensity claimed by Plaintiff's subjective complaints as unsupported by the objective medical evidence.   It was entirely properly for the ALJ to weigh the evidence in this manner.   *See Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) ("When a conflict in the evidence exists, the ALJ may choose whom to credit . . . ."); *Green v. Schweiker*, 749 F.2d 1066, 1069-70 (3d Cir. 1984) ("[S]ubjective complaints of pain, without more, do not in themselves constitute disability."); *cf. Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979) (holding that great weight is given to a claimant's subjective testimony *only* when it is supported by competent medical evidence).   Accordingly, I reject Plaintiff's contention that the RFC failed to include limitations based on Plaintiff's vision or mental health impairments.

---

[10]   Plaintiff contends that the ALJ failed to address the records of her treating psychologist at RBMHC, Dr. Banasiak.   I disagree.   Although the ALJ's decision does not refer to Dr. Banasiak by name, the ALJ explicitly referenced Plaintiff's treatment records from RBMHC is assessing Plaintiff's mental health impairment.   AR 52-53.   Indeed, the ALJ's decision references information drawn from Dr. Banasiak's intake notes. *See, e.g.*, AR 51 (citing Dr. Banasiak's notes that Plaintiff arrived to appointment alone); AR 339.   Thus, I reject Plaintiff's argument that the ALJ failed to consider Plaintiff's mental health records.   Similarly, I reject Plaintiff's contention that the ALJ failed to consider the diagnoses of panic disorder and anxiety; as discussed in more detail in connection with Plaintiff's step two challenge, *supra* Part II.C.2, the ALJ did not ignore evidence of Plaintiff's mental health impairment.   Instead the ALJ reviewed and considered the evidence of Plaintiff's anxiety and panic disorder, and, comparing it to other record evidence, including Plaintiff's own testimony, found that Plaintiff's mental health impairments did not rise to the level of a severe mental health impairment.   There is no error in this regard. *See, e.g.*, *Smith v. Califano*, 637 F.2d at 972.

Plaintiff also contends the ALJ erred by not including in the RFC limitations due to her diabetes, such as limitations due to her hypoglycemic episodes.  *See* Pl. Br., 28-30.  Plaintiff's argument in this regard turns primarily on the contention that the ALJ erroneously discounted these symptoms—which, Plaintiff testified, could pertain to either her diabetes, her vertigo, or her anxiety—on the grounds that these symptoms could be appropriately managed if Plaintiff took her prescribed medications.  *See id.* at 29 (arguing that ALJ failed to incorporate into RFC limitations based on Plaintiff's testimony describing her confusion in how or when to take her medication). The difficulty with Plaintiff's argument in this regard is that there is no objective medical evidence that Plaintiff points to, or that this Court can identify, supporting Plaintiff's claim that her impairments cannot be managed by adequately following her medication regimen.  Although Plaintiff testified that she sometimes suffers vertigo episodes because she believes it to be a hypoglycemic episode, and thus fails to take the appropriate medication, or vice-versa, she offers no evidence where she presented these concerns to her treating or prescribing physicians.  Because of this lack of objective medical evidence supporting Plaintiff's complaints that her medication regime was ineffective, I find that the ALJ did not err by failing to include limitations in the RFC based on her hypoglycemic episodes or other symptoms that result from Plaintiff's failure to take her medication.[11]  *See, e.g.*, *Holiday v. Barnhart*, 76 F. App'x at 482 (finding no error in ALJ giving little weight to claimant's testimony regarding severity of impairment where testimony not

---

[11]     Plaintiff also claims that the ALJ failed to take into account any limitations based on a combination of her impairments, both severe and non-severe.  Reading the ALJ's decision as a whole, as I must, *see Jones v. Barnhart*, 364 F.3d at 505, I find that the ALJ properly considered Plaintiff's impairments both in isolation and in combination.  For example, the ALJ set forth his reasoning for rejecting some of the opinions of the state agency consultative examiners in favor of other record evidence that discusses both the physical and mental impairments, which I find demonstrates that the ALJ considered Plaintiff's impairments both individually and in combination.  Accordingly, I reject Plaintiff's argument in this regard.

supported by the record).  Plaintiff raises no other challenge to the ALJ's decision, and, having reviewed the record, I am satisfied that the ALJ properly determined, at step four, that Plaintiff could have performed her former job as a customer service employee and was therefore not disabled under the Act for the applicable period.

It bears noting, in a case such as this one, that although the record contains evidence supporting Plaintiff's claimed impairments and, to some degree, the severity of those impairments, it also contains substantial evidence supporting the ALJ's decision.  This Court does not review the ALJ's decision *de novo*, or even under slightly deferential review; rather, as noted above, I am constrained to uphold the ALJ's decision if it is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Knepp v. Apfel*, 204 F.3d at 83 (holding that Commissioner's decisions regarding questions of fact are deemed conclusive by a reviewing court if supported by "substantial evidence in the record").  Here, notwithstanding the variety of Plaintiff's impairments, I am satisfied that there is substantial evidence supporting the ALJ's decision that Plaintiff's several impairments did not render her disabled for the applicable period.

**CONCLUSION**

For the reasons set forth above, the ALJ's decision is AFFIRMED.

An appropriate Order shall follow.


Dated:  June 26, 2014                         /s/ Freda L. Wolfson
                                              Freda L. Wolfson, U.S.D.J.